CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
NOV 0 3 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Criminal Action No. 7:06CR00045 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| KAREEM BERLIN FARRIOR, ) | |
| ) | By: Hon. Glen E. Conrad |
| Defendant. ) | United States District Judge |

This matter is before the court on two motions submitted by the defendant. The first is the defendant's motion to suppress all of the evidence gathered subsequent to the April 16, 2006 traffic stop that occurred in Pulaski, Virginia and to suppress the statement he made to two officers in Roanoke, Virginia on May 20, 2006. The second is the defendant's motion to sever the two counts resulting from the two incidents. A hearing was conducted on Thursday, November 2, 2006. Officers Morris and Dowdy, Sergeant Anderson, and Agent Christmas testified for the United States. The defendant testified only as to what transpired subsequent to his arrest in Roanoke on May 30, 2006. For the following reasons, the motions to suppress and to sever will be denied.

## I. Factual and Procedural Background

On June 1, 2006, the defendant was indicted under two counts: Count I — possession with the intent to distribute a quantity of crack on or about April 21, 2006 ("the Pulaski incident"); and Count II — possession with the intent to distribute 50 grams or more of crack on or about May 10, 2006 ("the Roanoke incident"). 21 U.S.C. § 841(a)(1) and (b)(1)(C); 21 U.S.C. § 841(a)(1) and (b)(1)(A); 18 U.S.C. § 2.

### A. The Pulaski Incident

On April 16, 2006, the Pulaski police received an anonymous tip that a car with New York license plate number CUL-7463 had been involved in drug transactions in the Highland Terrace area of Pulaski, Virginia. Nearly five days later, at 1 A.M., Officer Morris discovered the car several blocks away on another street in Pulaski near a residence known to the officer to be a center of drug activity. Soon thereafter, the vehicle passed Officer Morris, who noticed that the license plate light was out.[1] Officer Morris immediately notified the dispatcher that he had found the vehicle and was going to stop it. The facts are in dispute as to whether Officer Morris then called Sergeant Anderson about the stop or whether Sergeant Anderson heard of the stop through the police dispatch system. Officer Morris stopped the vehicle.

At some point soon after the stop and after he learned of the defendant's identity, Sergeant Anderson contacted the police dispatcher to obtain a criminal history and to request a canine unit on the scene. Sergeant Anderson proceeded to the scene. Meanwhile, Officer Dowdy of the canine unit was contacted at his home, which was located eight to nine blocks from the scene. Officer Dowdy immediately dressed, got his dog, which lived with him, and also proceeded to the scene.

Officer Morris took the defendant's Connecticut driver's license and car registration and checked their validity. Both proved to be valid. Officer Morris returned to the car. Rather than give Farrior a ticket, Officer Morris returned Farrior's license and registration and warned him that he needed to have his tag light fixed. Officer Morris told the defendant that he was free to go.

---

[1] Illumination of the rear license plate of any vehicle is required by Virginia Code § 46.2-1013.

2

Officer Morris then asked Farrior to step out of the car. The defendant said that he could talk to the officer from inside the car. Officer Morris advised the defendant that the town had drug problems in the area and asked the defendant if he had any drugs or weapons. Farrior said that he did not. Officer Morris then asked if he could search the car. Farrior said that he did not have a problem with a search. Farrior got out of the car and Officer Morris conducted a brief pat down to search for weapons. Officer Morris then searched the inside of Farrior's car.

While Officer Morris was inside the vehicle conducting the search, Sergeant Anderson arrived on the scene. Sergeant Anderson stayed in his car for a short period of time while he obtained the remainder of Farrior's criminal history. He then exited the car and spoke to the defendant. At this point, Officer Morris was still searching the defendant's car. Sergeant Anderson asked Farrior what he was doing in Pulaski, whether he knew anyone on that street, and if he had ever been in trouble. When Farrior indicated that he had not been in trouble, Sergeant Anderson asked him about his prior felony drug convictions. The defendant was reluctant to talk about those convictions, indicating that they occurred a long time before.

Officer Morris concluded his search, finding nothing suspicious. Sergeant Anderson asked Officer Morris if he had given Farrior a warning ticket. Officer Morris said that he had not, and Sergeant Anderson instructed him to do so. Officer Morris once again took Farrior's license and registration back to his vehicle to write the warning ticket. Officer Morris completed the ticket and was explaining it to the defendant, when the canine unit arrived.

Sergeant Anderson advised Officer Dowdy of the canine unit that Farrior had consented to a vehicle search. The drug dog was taken on a quick pass of the outside of the car, where it alerted to the trunk. Officer Dowdy then took the dog inside the car, where it alerted to the

3

console area. Sergeant Anderson and Officer Dowdy then searched the inside of Farrior's car again, noticing several indications that the carpeting and consoles had been altered. At that point, Sergeant Anderson searched the trunk of the car and found a black bag with a razor and some white powdery residue. Based on testimony at the hearing, the court finds as a matter of fact that between 30 to 37 minutes elapsed between the time Farrior was pulled over and the time Sergeant Anderson found the black bag in Farrior's trunk.

Sergeant Anderson approached Farrior and said that the dog had indicated the presence of drugs in the car and asked the defendant to remove his shoes. The defendant at first refused, and Sergeant Anderson said he had no choice. The defendant kicked off his boots. Sergeant Anderson found 6.5 g of cocaine base and $2,720 hidden in the insoles.

After his arrest, Farrior was Mirandized. Farrior later admitted that the cocaine was his, but stated that he had come to Pulaski to buy, not to sell. The defendant stated that the money in his shoe was money he had earned as a bus driver in Connecticut. Farrior was charged and his car was impounded.

**B.     The Roanoke Incident**

On May 10, 2006, the Roanoke Police responded to a call and found Farrior lying on the ground, having been shot three times. Farrior was taken to the hospital but "refused to cooperate with police as to who shot him." United States' Opposition Memorandum at 4. The police found Farrior's rental car one block from the shooting and had it towed. On May 12, 2006, after obtaining a search warrant for the vehicle, the police found more than one pound of crack in the trunk of the car hidden inside Farrior's boot.

On May 30, 2006, as Farrior was being discharged from the hospital, he was arrested by

4

Drug Enforcement Agency Special Agent Christmas and Task Force Officer Richard Philpott for possession with intent to distribute more than 50 g of cocaine base. The United States asserts that "[a]t no time did Farrior appear to be under the influence of any medication. He was lucid and appeared fully aware of what was transpiring." *Id.* Farrior was not read his *Miranda* rights but was told that he was being transported to the U.S. Marshals' office. The defendant was not questioned on the way to the office.

While in the elevator to the U.S. Marshals' office, the defendant inquired as to what had happened to the three people who shot him. When told that the matter was being handled by the Roanoke police, Farrior said, "well they shot me because they didn't want to pay me!"

### C. The Defendant's Motion to Suppress

#### 1. *The Pulaski Incident*

Farrior first moves to suppress evidence obtained during the traffic stop in Pulaski. The defendant does not argue the constitutionality of the initial stop. Rather, the defendant contends that the initial stop should have been terminated at the point when Officer Morris first told Farrior that he was free to go. The defendant asserts that he did not freely consent to the search of his vehicle but was forced to get out of the car. Since no consent was given, the defendant argues that the subsequent search and seizure violated his Fourth Amendment rights because the officers lacked cause to continue the stop beyond the scope of the initial encounter. Moreover, the defendant argues that even if consent had been given, the duration of time between the purported consent and the time at which Officer Dowdy arrived with the canine unit was unreasonable and in violation of his Fourth Amendment rights.

#### 2. *The Roanoke Incident*

In his brief, the defendant argued that the statements made on May 30, 2006 were involuntary and did not constitute a knowing, free, and intelligent waiver of his rights. At the hearing, however, the defendant testified that he did not make such a statement in the elevator.

## II. Discussion

### A. The Pulaski Incident

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Because a warrantless search and seizure is presumptively unlawful, the government bears the burden to prove that the search and seizure falls under an established exception. *See United States v. Smith*, 396 F.3d 579, 585 (4th Cir. 2005). The United States here argues that the initial stop was excepted because of reasonable suspicion that Farrior was violating Virginia Code § 46.2-1013, the search of Farrior's car was excepted because the defendant consented, and the search of his person was excepted as a search incident to arrest.

In assessing whether the United States has met its burden to show conduct within an exception, the court must assess the officers' actions, and not their state of mind, in light of the circumstances presented. *Maryland v. Macon*, 472 U.S. 463, 470–71 (1985). The inquiry is fact-driven. The court is required to consider the objective facts as well as the circumstances of the incident.

#### 1. *The Stop*

There is nothing objectionable about the initial stop of the defendant's vehicle under current Fourth Amendment jurisprudence. An automobile stop is an established exception to the warrant requirement so long as it is "justified by probable cause or a reasonable suspicion, based

6
Case 7:06-cr-00045-GEC-mfu   Document 37   Filed 11/03/06   Page 6 of 14   Pageid#: 84

on specific and articulable facts, of unlawful conduct." *United States v. Wilson*, 205 F.3d 720, 722–23 (4th Cir. 2000); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). Any traffic offense provides the reasonable suspicion required under *Wilson*, even when the stop is pretextual.[2] *United States v. Hassan El*, 5 F.3d 726, 729–31 (4th Cir. 1993). Officer Morris testified that he pulled Farrior over for an inoperable license plate light in violation of Virginia Code § 46.2-1013, and this testimony is not disputed.

## 2. *Defendant's Consent to the Search of His Vehicle*

The validity of the initial stop, however, does not end the court's analysis. The court must inquire further because "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Because the officer's justification for the traffic stop here is premised on a reasonable suspicion based on a traffic code violation, the permissible scope of the initial stop is confined to the duration and level of invasiveness necessary to investigate that violation. In *United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992), the Fourth Circuit adopted the rule that a proper investigative stop occurs when an officer requests the license and registration, runs a computer check, and issues a citation. *Rusher*, 966 F.2d at 876 (citing *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988)). Since the searches at issue in this incident occurred after Officer Morris had completed the investigation, returned Farrior's license and registration, and told Farrior he was free to go, the court must inquire as to what justification existed for detaining Farrior further and searching his vehicle and

---

[2] A "pretextual stop" occurs when "police use a legal justification to make [a] stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a [legal] stop." *United States v. Guzman*, 862 F.2d 1512, 1516 (10th Cir. 1988).

7

his person.

The United States asserts that the searches were permissible because Farrior gave consent. The United States presented the testimony of Officer Morris, who testified that Farrior consented to a search and exited the car after being asked about the presence of drugs or weapons in the car. The United States further posits that the defendant's consent to search his vehicle is rational in this case because the drugs and money were in his shoes. This court finds as a matter of fact, based on the testimony of Officer Morris, that after Officer Morris returned the defendant's license and registration, the defendant consented to a search of his car. Indeed, there is no evidence to the contrary.

The court must further inquire, as a matter of law, as to whether that consent was knowing and voluntary. An encounter such as this is consensual if a reasonable person in Farrior's position would have felt free to decline the request. *Florida v. Bostick*, 501 U.S. 429, 439 (1991). The United States bears the burden of demonstrating that the consent to search was voluntarily given by the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). Whether consent is voluntary is a factual determination made by examining the totality of the circumstances. *Id.* at 248–49; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). Considerations include the characteristics of the defendant (e.g., age, maturity, education, intelligence, experience) and conditions under which consent was given (e.g., conduct of the officers; number of officers present; duration, time, and location of the encounter). *Lattimore*, 87 F.3d at 650. The court must also consider whether the accused was aware he could refuse consent; however, the government does not have to prove that the accused knew that he could refuse in order to prove the consent voluntary. *Id.*

8

The court notes that one important factor to consider in determining the voluntariness of Farrior's consent is that Officer Morris returned Farrior's license to Farrior before asking to search the car. A series of Fourth Circuit cases have found that a purportedly consensual encounter following a routine traffic stop did not constitute a seizure of the individual so long as the officer returned the driver's license before the search. *See United States v. Meikle*, 407 F.3d 670, 673 (4th Cir. 2005); *United States v. Sullivan*, 138 F.3d 126, 133 (4th Cir. 1998); *Lattimore*, 87 F.3d at 653; *Rusher*, 966 F.2d at 877.

The court finds that the defendant's initial consent to search the vehicle was voluntarily given. The fact that Officer Morris returned Farrior's license and explicitly told Farrior that he was free to go before asking the defendant to consent to a search of his vehicle strongly indicates that no seizure occurred at that point within the meaning of the Fourth Amendment. *United States v. Weaver*, 282 F.3d 302, 311 (4th Cir. 2002). That fact alone, however, is not dispositive. The voluntariness of Farrior's consent is also supported by the circumstances surrounding Officer Morris' request and Farrior's response. Officer Morris testified that after telling the defendant that he was free to go, he asked Farrior if he would step out of the car. Farrior responded that he could talk from inside the car. Officer Morris proceeded to do so. Officer Morris testified that he explained to Farrior that the Town of Pulaski was having a lot of drug problems in that area. Officer Morris next asked Farrior if he had any drugs or guns, to which Farrior replied in the negative. Officer Morris then asked Farrior if he could search his car. Farrior consented and stepped out of the car. The court believes that these circumstances indicate that Farrior was not intimidated and that a reasonable person in his position would believe that he had a choice to exercise. Therefore, the court finds and concludes that a reasonable person in Farrior's position

9

would have felt free to decline Officer Morris' request.

### 3. *Issuing the Ticket*

After the search was completed and nothing was found, Sergeant Anderson told Officer Morris to issue a citation for the inoperable tag light. Officer Morris testified that he initially did not intend to give Farrior a ticket, but instead was willing to let the defendant go with just a verbal warning. After speaking with Sergeant Anderson, Officer Morris again took Farrior's license and registration and went to the police car to prepare the citation. Officer Morris testified that he had finished the citation and was explaining it to Farrior when the canine unit arrived.

The court finds that despite being unusual in sequence, there is nothing in these events that impinges the defendant's constitutional rights. Officer Morris testified that he had just completed his field training months before the incident. At field training, he had been trained to issue summons in situations like these. Officer Morris testified that he did not like to give summons because they required the defendant to appear in court for a minor offense. Officer Morris testified that at the time he did not know about the process of giving a warning ticket. Sergeant Anderson is Officer Morris' superior on the force. When he arrived on the scene, he noted that a citation had not been issued and told Officer Morris to do so. The court finds that these facts are not suggestive of any attempt at subterfuge or stalling on the part of the officers. Because no harmful intent is found on the part of the police and because the testimony at the hearing shows that the additional time required to take the license and registration and write the ticket was minimal, the court finds that this sequence of events did not violate the defendant's Fourth Amendment rights.

### 4. *The Drug Dog Search*

10

The court finds that the drug dog search of the defendant's vehicle did not violate his Fourth Amendment rights. Searches conducted by drug-sniffing dogs are legally discrete from other types of searches. In *United States v. Place*, 462 U.S. 696 (1983), the Court found that the use of drug-sniffing dogs to detect contraband is *sui generis* because it does not require the exposure of non-contraband items and, as such, is not considered a search within the meaning of the Fourth Amendment. *Place*, 462 U.S. at 707.

The Court relied on the *sui generis* nature of canine searches in its recent decision in *Caballes*. In *Caballes*, the Court addressed the issue of whether an officer must have reasonable suspicion before conducting a dog sniff during a legitimate traffic stop and found that, because of the circumstances in that case, the officer did not need reasonable suspicion. *Caballes*, 543 U.S. at 407. The Court stated that the use of a well-trained narcotics dog during a lawful traffic stop does not generally implicate a defendant's privacy interest. *Id.* at 409. In making its decision, the Court relied on the facts that the sniff search was performed on the exterior of the car and that the search occurred during a lawful traffic stop. *Id.*

The court concludes that the reasoning in *Caballes* applies here. Officer Dowdy testified that he first ran the dog around the outside of Farrior's car, where it alerted to the possible presence of drugs in the trunk. The initial run was justified under *Caballes*. After the dog alerted to the trunk, the officers had reasonable suspicion to search inside Farrior's car again and to search his trunk. Therefore, the court finds that nothing in the timing or conduct of the canine search violated the defendant's Fourth Amendment rights.

**B.     Roanoke Incident**

Farrior was not read his *Miranda* rights before making his statement to Officers

11

Christmas and Philpott. Farrior was arrested for possession with intent to distribute as he was being discharged from the hospital. The two officers told Farrior that they were transporting him to the U.S. Marshal's Office and did not question him during the trip. The United States argues that, while in transit, Farrior voluntarily related to the officers that he was shot because his attackers did not want to pay him. The defendant seeks to have that statement suppressed as an involuntary inculpatory admission.

The court finds that there is nothing to support the defendant's argument. At the hearing, the defendant testified that it was his position that he did not make the statement in the elevator. Whether or not the statement was made is clearly a matter for the jury to decide. The court finds that the statement is admissible, subject to impeachment.

### III. Defendant's Motion to Sever Counts

Farrior also moves the court to sever the two counts against him pursuant to the court's discretion under Rules 8 and 14 of the Federal Rules of Criminal Procedure. As grounds for severance, the defendant asserts that the Pulaski and Roanoke incidents are not based on the same act or transaction and do not constitute a common scheme or plan and, as such, will require dissimilar evidence. The defendant asserts that the prejudice he will suffer from the joinder of the charges outweighs the court's interest in economic efficiency. The defendant argues that there is a strong likelihood of prejudice because the amount of drugs involved in the Roanoke incident may influence the jury's determination of guilt for the Pulaski offense.

In deciding whether the counts should be severed, the court must weigh the prejudice to the accused against the interest in efficient administration of judicial resources. *United States v. Jamar*, 561 F.2d 1103, 1106 (4th Cir. 1977). The defendant has the burden to put forth enough

information to demonstrate a "strong showing of prejudice" if severance is not granted. *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted). It is not sufficient for the defendant to merely show that joinder would make his defense more difficult or severance might offer a better chance of acquittal. *Id.* Instead, the defendant must present particularized arguments regarding the testimony and evidence to be given on each count and the reasons for remaining silent on the joined counts. *Jamar*, 561 F.2d at 1108. If such a showing is made, the court must evaluate whether the possible prejudice outweighs the interests favoring joinder. *Id.* at 1108 n.9. Without such a showing, the court is unable to weigh the defendant's interests, and the motion to sever should be denied.

At the hearing, the defendant did not present any particularized argument of the evidence that would be presented on one count that would prejudice the jury's determination on the other. Without such a showing, the court finds that the motion for severance is without merit. Furthermore, the court notes that even if the counts were tried separately, much of the evidence of one incident would be admissible at a trial for the other under Federal Rule of Evidence 404(b). The Pulaski and Roanoke incidents are distinct acts that share some common pieces of evidence. Any prejudice that may result from allowing the counts to proceed in one action is not so severe as to foreclose the possibility of a fair trial if an appropriate limiting instruction is given.

## IV. Conclusion

With regard to the Pulaski incident, the court concludes that the officers complied with the requirements of the Fourth Amendment during the stop and subsequent search of Farrior's vehicle and his person. The defendant's motion to suppress the evidence obtained during this

13

stop is therefore denied.

With regard to the Roanoke incident, the court likewise concludes that the officers' conduct while transporting Farrior from the hospital to the U.S. Marshal's office did not impinge on Farrior's Fifth Amendment right against self-incrimination. The court therefore denies the defendant's motion to suppress the potentially inculpatory statements.

Additionally, the court finds that the defendant has not shown that he would be unduly prejudiced by trying Counts I and II in the same trial. The court therefore denies the defendant's motion to sever Counts I and II.

The Clerk is directed to send certified copies of this Memorandum Opinion and the accompanying Order to all counsel of record.

DATED this 2nd day of November, 2006.

*/s/ Glen Conrad*
United States District Judge

14

Case 7:06-cr-00045-GEC-mfu   Document 37   Filed 11/03/06   Page 14 of 14   Pageid#: 92