CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED
NOV 30 2009
JOHN F. CORCORAN, CLERK
BY: DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 7:06CR00045 |
| ) | (Case No. 7:09CV80155) |
| v. ) | |
| ) | MEMORANDUM OPINION |
| ) | |
| KAREEM BERLIN FARRIOR, ) | By: Glen E. Conrad |
| ) | United States District Judge |
| Defendant. ) | |

The defendant, a federal inmate, brings this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C.A. § 2255. The defendant is serving a life sentence for drug offenses, based, in part, on the court's finding that he qualified as a career offender. The government filed a motion to dismiss, and the defendant responded, making the matter ripe for consideration. Upon review of the record, the court finds that the motion to dismiss must be granted.

## I. Background

In June 2006, a grand jury in Roanoke returned a two-count indictment charging Kareem Berlin Farrior with two counts of distributing crack cocaine or possessing crack cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C): on April 21, 2006 (Count One) and on May 10, 2006 (Count Two). Farrior pleaded not guilty to both charges. Before trial, he moved to suppress the evidence against him as to Count One on grounds that it was obtained through an illegal search and seizure and to suppress certain statements attributed to him on May 30, 2006. The court conducted a suppression hearing on November 2, 2006 and denied the motion to suppress in a written opinion.

Farrior stood trial before a jury on November 29 and 30, 2006. The jury found him guilty on both counts. Because Farrior had two prior felony drug offenses, the court sentenced him as a career offender and imposed a sentence of 360 months imprisonment as to Count One and a mandatory life sentence, pursuant to 21 U.S.C. § 841(b)(1)(A), as to Count Two, with the two sentences to run concurrent to each other.

Farrior appealed his convictions and sentence on numerous grounds, including an argument that the evidence against him as to Count One was obtained through an illegal search and seizure. The United States Court of Appeals for the Fourth Circuit affirmed the judgment in a published opinion, and the United States Supreme Court denied Farrior's petition for a writ of certiorari. United States v. Farrior, 535 F.3d 210 (4th Cir.), cert. denied, 129 S. Ct. 743 (2008).

In this § 2255 motion, Farrior alleges the following grounds for relief:

1. Counsel provided ineffective assistance in that

    a. Counsel did not move to suppress the drugs related to Count Two;

    b. Counsel failed to present known exculpatory evidence, namely, bank statements and bills;

    c. Counsel failed to object and move for judgment of acquittal when the defendant was "actually convicted of a crime other than that charged in the indictment";

    d. Counsel failed to allege "constructive amendment" as a formal ground on direct appeal after using that language to describe the violation; and

    e. Counsel's cumulative errors violated the defendant's constitutional rights.

2. A constructive amendment occurred when the jury returned a verdict that the defendant had conspired to distribute crack cocaine, although the indictment did not charge conspiracy.

2

## II. Discussion

To state a claim for relief under § 2255, a federal defendant must prove that one of the following occurred: (1) His sentence was "imposed in violation of the Constitution or laws of the United States"; (2) The "court was without jurisdiction to impose such sentence"; or (3) The "sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). In a § 2255 motion, the defendant bears the burden of proving grounds for a collateral attack by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir.1958).

The court must hold pleadings filed by a pro se litigant "to less stringent standards than formal pleadings drafted by lawyers." See Haines v. Kerner, 404 U.S. 519, 520 (1972). The requirement of liberal construction does not mean, however, that the court can ignore a clear failure in the pleading to "allege anything that remotely suggests a factual basis for the claim." Weller v. Department of Social Servs., 901 F.2d 387, 391 (4th Cir. 1990). Similarly, "judges are not . . . required to construct a [pro se] party's legal arguments for him." Small v. Endicott, 998 F.2d 411, 417-18 (7th Cir. 1993). The judge is not required to "attempt[ ] to divine the point" the litigant seeks to make about the specific facet of the criminal proceedings that he challenges. Id.

To prove that counsel's representation was so defective as to require that the conviction be vacated, petitioner must satisfy both prongs of a two-part standard by demonstrating that counsel's defective performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. To do so, petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689

(internal quotations omitted). Counsel has no constitutional duty to raise every non-frivolous issue or argument requested by defendant. Jones v. Barnes, 463 U.S. 745, 754 (1983). Second, to show prejudice, the petitioner must demonstrate a "reasonable probability" that, but for counsel's errors, the outcome would have been different. Id. at 694-95. If it is clear that petitioner has not satisfied one prong of the Strickland test, the court need not inquire whether he has satisfied the other prong. Id. at 697.

### A. No Motion to Suppress as to Count Two

Count Two charged that on or about May 10, 2006, Farrior distributed, or possessed with intent to distribute, fifty or more grams of a mixture containing cocaine base. The evidence presented at trial reflected the following sequence of events. On the evening of May 10, 2006, Roanoke police officer Harris responded to a report of a gunshot wound. At the scene, he found Farrior leaning against a car, saying that he had been shot. Ambulance personnel arrived shortly and began attending to Farrior's wounds. In the process, they removed his pants and his size 10M Timberland boots. Other officers interviewed witnesses, one of whom reported that he had seen a silver vehicle parked in front of 731 Hanover Street, where three black males were standing on the porch. Another witness reported that she had seen three black males get out of the silver car and enter that residence. Police located the car and, after determining that Farrior had rented this vehicle from Avis Rent-A-Car on May 4, 2006, had it towed to a locked and secured location under the city courthouse. They later obtained a warrant to search the car. Among other items, a crime scene technician found one left 10M Timberland boot inside the car and a matching right 10M Timberland boot hidden in the trunk of the car underneath some carpet where the spare tire was located. Inside

the boot in the trunk, the technician found 42 individual wrapped baggies of crack cocaine weighing 469.5 grams.

Farrior, from his hospital bed, called Avis on May 29, 2006, inquiring about what had happened to his possessions in the trunk of the rental vehicle. The next day, officers approached Farrior as he was preparing to leave the hospital and advised him that they had an arrest warrant charging him with possessing with intent to distribute more than fifty grams of crack cocaine and advised him not to say anything. In the elevator at the federal building, however, Farrior asked an officer, "What happened to the guys that shot me?" The officer said that he was not involved in the investigation of the shooting. Farrior then said, "They shot me because they didn't want to pay me."

Farrior offers only a conclusory assertion in his § 2255 motion that counsel should have moved to suppress "the drugs" in Count Two.[1] He states no legal grounds on which she could have done so. Counsel, in her affidavit in support of the motion to dismiss, states her belief that no grounds for suppression of this evidence existed, based on the fact that Farrior denied any knowledge of the drugs. Moreover, respondent argues, police lawfully towed the car as part of their investigation of the shooting and then obtained a valid search warrant to examine its contents. Farrior does not dispute the lawfulness of the officers' actions in towing and searching the car. As Farrior thus fails to demonstrate how counsel's failure to move for suppression of the drugs related

---

[1] In the section of his § 2255 motion discussing this claim, Farrior also alleges that counsel failed to conduct appropriate pretrial investigation of potential witnesses and of potential impeachment information, although he does not enumerate these allegations as a separate claim of ineffective assistance. Counsel states that the defense retained an investigator to interview witnesses, including employees of the rental car company, police officers from Pulaski, and neighbors in the area where Farrior was shot. Farrior does not dispute this information. He also fails to allege any facts regarding what other potential witnesses or impeachment material counsel allegedly should have discovered or to demonstrate how this additional evidence would have affected the outcome of his case. With no facts alleged in support, this claim fails on its face under both prongs of Strickland, 466 U.S. at 689, and must be dismissed.

to Count Two was either deficient representation or prejudicial to the defense, this ineffective assistance claim fails under <u>Strickland</u>, and must be dismissed.

### B. Bank Statements as Exculpatory Evidence

The trial evidence reflected the following sequence of events related to Count One. After receiving a tip on April 16, 2006 that a green vehicle with New York registration was suspected in drug trafficking in the Highland Terrace area of Pulaski, an officer found the car. However, it was unoccupied. An officer spotted the vehicle again on April 21, 2006, parked on Maple Street in Pulaski, in an area known for drug trafficking. The officer staked out the area. About five minutes later, he saw the vehicle passing him and noticed that the licence tag light was inoperable. He conducted a traffic stop, told the lone occupant of the car (Farrior) the reason for the stop, and asked for license and registration. Farrior provided the officer with a Connecticut driver's license and vehicle registration, stating that the car belonged to his wife. After verifying the documents, the officer asked Farrior if he would step out of the car and speak with him. Farrior said he would talk from the car and denied that the car contained any illegal drugs or firearms. He then consented to have the officer search the vehicle and got out. The search of the interior uncovered nothing. Other officers arrived, patted Farrior down, asked a dispatcher to conduct a criminal background check on Farrior, and requested a K-9 unit. Farrior said that he did not know anyone in Highland Terrace area, but did know "Junior" on Maple Street.

Taking a quick pass of the outside of the car, the police drug dog alerted to the trunk. Inside the car, the dog alerted to the console. Examination revealed that the carpet and console had been altered. Inside the trunk, officers found a black bag containing a razor type instrument and white powder residue. The dog alerted to the bag. An officer explained these discoveries to Farrior and

asked him to remove his shoes. At first, Farrior refused, saying that he had already been searched. When the officer told him he had no choice because of the drug paraphernalia found in the car, he kicked off his Timberland boots. Inside one of the boots, an officer found what was later determined to be 5.5 grams of crack cocaine wrapped in a plastic baggie. Under the soles of each boot, officers found money—bills in varying denominations totaling $2,720. Police then placed Farrior under arrest. After receiving Miranda warnings, Farrior stated that he had purchased the cocaine in Pulaski and that the currency found in his boots was money he had earned working for a bus company in Connecticut. When an officer asked him why he had so much money in his boots, Farrior stated that he did not like banks.

Count One of the indictment charged that on April 21, 2006, Farrior distributed or possessed with intent to distribute cocaine base. Farrior now argues that counsel was ineffective for failing to produce "bank statements and bills" during the suppression hearing to corroborate Farrior's assertion to police that the money found in his boots was not proceeds of any illegal drug transaction. He complains that admission of evidence concerning the money found in his boot prejudiced his case, because it allowed the prosecutor to argue in closing that Farrior likely used the money for making change during drug transactions. (See Dkt. No. 57, Tr. Closing Arg. 6, Nov. 30, 2006.)

Counsel moved to suppress the evidence seized on April 21, 2006, arguing that although the initial traffic stop was lawful, the "seizure" became unreasonable when officers exceeded the scope of that initial stop by detaining Farrior for a lengthy period while writing him a warning and bringing in the drug dog to sniff the car. The court found that the search was not unreasonable because Farrior voluntarily consented to having the car searched after the officer had returned his license to him. (Mem. Op. 8-11, Nov. 11, 2006.) Farrior does not demonstrate that counsel's choice not to

introduce the bank statements during the suppression hearing was an unreasonable or prejudicial strategy. The bank account information did not bolster the argument that police officers detained Farrior for an unreasonable time after the initial traffic stop. Moreover, counsel reasonably could have believed that introducing the bank statements would damage Farrior's credibility, given his statement to police that he "didn't like banks." In any event, the bank statements do not prove that the money found in Farrior's boot on April 21, 2006, came from a legitimate source rather than from previous drug dealings.

At trial, the government introduced documentation indicating that Farrior had a checking account, a savings account with over $8,000 in it, and an active CD account. (JA 120.) Counsel used this information to portray Farrior as a man who was gainfully employed and paid his bills and child support payments on time. At sentencing, counsel successfully relied on the banking information in objecting to an increase in the amount of drugs attributable to Farrior based on the currency found in his boots.[2] Finding no ground upon which counsel's use of the bank statements could be found deficient or prejudicial, during pretrial or trial proceedings, the court will grant the motion to dismiss as to this claim.

### C. Verdict Form Discrepancy

At the conclusion of Farrior's jury trial on November 30, 2006, the court provided jurors with a verdict form for each count of the indictment and instructed them to begin their deliberations. The jurors returned with a verdict at 1:05 p.m. The clerk published the jury's verdict, finding Farrior

---

[2] Finally, by order entered April 6, 2009, the court granted Farrior's pro se motion for return of the money seized on April 21, 2006; specifically, the court found that there was not a preponderance of the evidence to establish that the currency seized from the defendant represented proceeds traceable to illegal drug transactions.

8

guilty on Count One of the indictment, described on the verdict form as "knowingly <u>conspiring</u> to distribute or possess with intent to distribute a mixture or substance containing a detectable amount of cocaine base or 'crack' on April 21, 2006," and on Count Two of the indictment, described on the verdict form as "knowingly <u>conspiring</u> to distribute or possess with intent to distribute a mixture or substance containing 50 grams or more of a detectable amount of cocaine base or 'crack' on May 10, 2006." (emphasis added) The court polled the jurors, who all responded that this was their verdict. The court then told jurors that their service in the case was concluded and thanked them for their work. Before recording the verdict or dismissing the jurors, however, the court called both counsel to the bench and pointed out that the verdict forms provided to the jurors were incorrect. The forms included the word "conspiring," although the indictment did not charge Farrior with conspiracy. Defense counsel asked for an opportunity to research the issue. After discussing alternative courses of action with counsel, the court stated to jurors:

> Ladies and gentlemen, in reviewing your verdict forms, I find that the Court has inadvertently tracked the language of a different statute as to each of the counts than were reflected in the indictment under which the defendant was charged. It doesn't change the instructions that the Court gave. The Court's instructions as to the elements of the two offenses charged in the indictment were correct and a proper statement of the applicable law. So it is only a matter of having the verdict forms correspond to the charges that were actually reflected in the indictment and explained to you in the charge of the Court.
> What I'm going to do is to have the verdict forms redrawn and to send you back out and to make sure that you all agree as to the charges for which you believe the government has established guilt beyond a reasonable doubt.

(<u>Id.</u> 35-36.) When the proper verdict forms were ready, the court again addressed jurors:

> So what I want you to do is to take the new forms back and look over those collectively, make sure that everyone sees the form. And then, if it is consistent with your deliberations, if it is consistent with the verdict that you rendered, I'll ask the foreperson to again complete the form and have you return here to open court.

9

> But, again, I want everyone to review the form and make sure that it depicts exactly your findings after all of you have deliberated and considered the evidence that was adduced in this case.

(Id. 37.) Ten minutes later, the jurors returned to the courtroom with the second completed jury verdict form. The court questioned jurors as to whether any of them felt that the current verdict form did not reflect the result of their deliberations as to the evidence presented during trial, and none responded. The clerk then published the verdict, finding Farrior guilty on both counts of the indictment. After the court again polled the jurors, who all responded that this was their verdict, the court dismissed the jurors and thanked them for their service.

On appeal, Farrior argued, among other things, that the court had erred in failing to declare a mistrial on double jeopardy grounds, based on the return of two jury verdicts, with the second verdict allegedly rendered after the jury had been dismissed from the case. The Fourth Circuit rejected this claim in a footnote as "without merit." Farrior, 535 F.3d at 217 n. 1.

In his § 2255 motion, Farrior alleges several claims related to the problem with the verdict forms: Claims 1(c), 1(d), and 2. None of these claims has any basis in fact or law.

First, in Claim 1(c), Farrior faults counsel for failing to move for judgment of acquittal when the jury returned a verdict finding him guilty of crimes other than those charged in the indictment or proven at trial. Counsel had no ground on which to make such a motion, as the jurors' initial verdict found Farrior guilty of Counts One and Two of the indictment. There is simply no evidence whatsoever that the jurors, in their deliberations, found Farrior guilty of conspiracy so as to "acquit" him of the charges in the indictment. No evidence of conspiracy was presented during the trial, and the jury was not instructed on the elements of a conspiracy offense. Moreover, there is no reasonable probability that a motion for judgment of acquittal at this point in the proceedings would have

resulted in a different outcome. The court had not yet released the jurors or recorded the verdict. Thus, the court retained authority to resolve any discrepancies regarding the verdict as initially returned. See Fed. R. Crim. P. 31(d). In an abundance of caution, the court asked jurors to ensure that their verdict was consistent with the accurate description of Counts One and Two as reflected on the corrected verdict forms. As demonstrated by their quick return of a guilty verdict on Counts One and Two using the properly worded verdict forms, the jurors found Farrior guilty of the charges as written in the indictment and not of any other charge. The court will dismiss Claim 1(c), as it fails under both prongs of Strickland.

Second, in Claim 1(d), Farrior claims that counsel should have argued on appeal that the word "conspiracy" in the initial verdict forms constituted a "constructive amendment" of the indictment. He raises a related, substantive "constructive amendment" argument in Claim 2. As stated, counsel raised a double jeopardy claim on appeal based on the verdict forms. Counsel had no constitutional duty to raise every possible, nonfrivolous argument on appeal regarding this issue, let alone a frivolous argument such as the one Farrior raises here.

"A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." United States v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994) (en banc). In Farrior's case, only the verdict forms were amended. The jurors' initial verdicts returned on the incorrectly worded forms were never recorded, and, when asked to ensure that the verdict forms coincided with their verdicts, the jurors quickly returned guilty verdicts on forms that accurately depicted the charges from the indictment. Thus, no support exists for an argument that a constructive amendment to the

indictment occurred or that the jurors possibly found Farrior guilty of a charge not "presented by the grand jury." Counsel's choice to raise a different argument on appeal was thus a reasonable strategy, and there is no reasonable probability that a constructive amendment argument on appeal would have resulted in a different outcome. Thus, Claim 2 has no basis in fact or law, and Claim 1(d) fails under Strickland. For the stated reasons, all of Farrior's claims concerning the verdict forms must be dismissed.

### D. Cumulative Errors

In Claim 1(e), Farrior asserts that the cumulative effect of his attorney's alleged errors deprived him of a fair trial. The United States Court of Appeals for the Fourth Circuit has resoundingly rejected the argument that an attorney's actions or omissions that do not individually constitute deficient representation under the Strickland standard can somehow be added together to create a constitutional violation. See Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998), cert. denied, 526 U.S. 1035 (1999) (internal quotations omitted and citing other courts' similar holdings). As the court has determined that none of Farrior's individual allegations of attorney error rose to the level of constitutional violation under Strickland, Farrior's cumulative error claim is without merit and must be dismissed.

### III. Conclusion

For these reasons, the court concludes that the motion to dismiss must be granted. An appropriate order will enter this day.

The petitioner is advised that he may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a judge of the circuit court of appeals or this court issues a certificate of appealability, pursuant to 28 U.S.C. § 2253(c). A certificate of

appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. § 2253(c)(1). Petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right." Therefore, this court declines to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322 (2003); Slack v. McDaniel, 529 U.S. 473 (2000). If petitioner intends to appeal and seek a certificate of appealability from the United States Court of Appeals for the Fourth Circuit, his first step is to file a notice of appeal with this court within 60 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to the defendant and to counsel of record for the government.

ENTER: This 30th day of NOVEMBER, 2009.

_____
United States District Judge